The document below is hereby signed.

Signed: December 18, 2015



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                          )
                               )
CHENG & COMPANY L.L.C.,        )      Case No. 15-00014
                               )      (Chapter 11)
            Debtor.            )      **Not for Publication in**
                               )      **West's Bankruptcy Reporter**

MEMORANDUM DECISION RE ESTIMATION OF THE CLAIM OF MR 619
<u>FOR PURPOSES OF VOTING ON THE DEBTOR'S PLAN OF REORGANIZATION</u>

This is the court's decision estimating the claim of MR 619

H Street Capital LLC ("MR 619") for purposes of voting on the

most recent plan of reorganization filed by the debtor, Cheng &

Company, L.L.C. ("Debtor").

I

MR 619 filed a proof of claim in this case asserting a

secured claim in the amount of $1,378,245.22 for "Money Loaned

under Note and Deed of Trust."  The Debtor has objected to that

claim.  The Debtor's objection asserts that the Debtor is

entitled to rescind the deed of trust securing MR 619's claim and

to recover damages suffered by the Debtor as a result of the

breach of certain obligations, which damages are a complete

offset to the amounts owed to MR 619.  The parties have agreed to the lifting of the automatic stay of 11 U.S.C. § 362(a) so that the Superior Court may proceed in litigation pending there to determine the merits of the Debtor's claims against MR 619 and other entities not before this court.

MR 619 requested pursuant to Bankruptcy Rule 3018(a) that its claim be temporarily allowed for the purpose of voting on the *Debtor's First Amended Plan of Reorganization, as Modified (July 20, 2015)* (Dkt. No. 68) ("Plan").  The court issued a scheduling order (Dkt. No. 83) for a hearing to be held for the purpose of estimating MR 619's claim.  Prior to the issuance of that scheduling order, the Debtor sought to amend its objection to MR 619's claim to include all of the grounds asserted in the Second Amended Complaint[1] that it had been permitted to file in the Superior Court.  The court granted that request, noting that the estimation hearing "ought to be one to reach an estimation of MR 619's claim based on the likely outcome in the Superior Court and that outcome's impact on MR 619's claim." *Order re Motion by Debtor to Amend its Objection to the Claim of MR 619 H Street Capital LLC* (Dkt. No. 98).  The estimation hearing was held on

---

[1] All citations in this decision to the Debtor's Second Amended Complaint will cite to the version attached to the *Memorandum of Law of MR 619 H Street Capital LLC in Connection with Rule 3018 Hearing* (Dkt. No. 110).  Debtor has not disputed that that version is the correct version of the Second Amended Complaint.

2

December 9, 10, 11, and 15, 2015.  Having heard evidence and the argument of counsel, and pursuant to the following findings of fact and conclusions of law, the court temporarily allows the claim of MR 619 in the full amount asserted.

II

Pursuant to Bankruptcy Rule 3018(a), a bankruptcy judge after notice and hearing "may temporarily allow the claim or interest [of a creditor] in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Fed. R. Bankr. P. 3018(a).  The policy behind temporarily allowing claims is to prevent possible abuse by plan proponents who might ensure acceptance of a plan by filing last minute objections to the claims of dissenting creditors.  *See Stone Hedge Properties v. Phoenix Capital Corp. (In re Stone Hedge Properties)*, 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995); *see also 9 Collier on Bankruptcy* ¶ 3018.01[5] (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).  "Neither the [Bankruptcy] Code nor the [Bankruptcy] Rules prescribe any method for estimating a claim [for voting purposes], and it is therefore committed to the reasonable discretion of the court, . . . which should employ whatever method is best suited to the circumstances of the case."  *In re Ralph Lauren Womenswear, Inc.*, 197 B.R. 771, 775 (Bankr. S.D. N.Y. 1996) (citation omitted).  The *Ralph Lauren* Court continued:

> This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate

3

disposition of [creditor's] claim.   This is due to the
fundamental difference between the adjudication of a
claim and its temporary allowance for plan purposes.

> A trier of fact determines which version
> [of the facts] is most probable and
> proceeds from there to determine an
> award in a fixed amount.   An estimator
> of claims must take into account the
> likelihood that each party's version
> might or might not be accepted by a
> trier of fact.   The estimated value of a
> claim is then the amount of the claim
> diminished by [the] probability that it
> may be sustainable only in part or not
> at all.

*In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503,
521 (Bankr. E.D.N.Y. 1994).   Thus, to the extent that I
have had to analyze the facts presented by the parties,
I have sought not to make definitive findings of fact,
but instead to assess the probabilities of the various
contentions made by the parties passing muster upon my
final adjudication of [creditor's] claim.   In contrast,
the parties' legal arguments must be evaluated not for
the probability that they have merit, but rather for
their correctness as a matter of governing law.   *In re
Thomson McKinnon Securities*, 191 B.R. at 979 (in
estimating a claim, court is "bound by the legal rules
which may govern the ultimate value of the claim.").

*In re Ralph Lauren Womenswear, Inc.*, 197 B.R. at 775.

III

The estimation of MR 619's claim turns on the interpretation

of the Purchase and Sale Agreement ("PSA" or "Agreement") of

December 21, 2012, entered into between the Debtor, MR 619, and

other parties.   MR 619, as the "H Street Purchaser" under the

Agreement, and the Debtor as the "H Street Seller" under the

Agreement, agreed that MR 619 would purchase the Debtor's

property known as the H Street Property if certain H Street

4

Acquisition Requirements were timely met.  MR 619 made a deposit
(the "H Street Deposit") upon which the Debtor was entitled to
make withdrawals but with the Debtor obligated to refund those
withdrawals in the event that MR 619 canceled the sale if the H
Street Acquisition Requirements were not timely met, an
obligation evidenced by a note (the "H Street Deposit Note") and
the payment of which was secured by a deed of trust (the "H
Street Mortgage").  The Debtor drew on the deposit, MR 619
canceled the sale when the H Street Acquisition Requirements were
not timely met, and MR 619 became a holder of a claim against the
Debtor.

What complicates the matter is that the Agreement also
addressed a separate sale of property known as the Eye Street
Property by its owners (the "Eye Street Sellers") (collectively,
614 Eye Street L.L.C., Anthony Chun Yuk Cheng, and Yun-Li Cheng)
to a purchaser (the "Eye Street Purchaser") (ACY and YL Cheng
LLC).  However, the Agreement made clear the H Street Property
sale and the Eye Street Property sale were independent of each
other.  First, the Debtor does not dispute that the H Street
Purchaser (MR 619) and the Eye Street Purchaser are separate
legal entities.  Second, the Agreement recited at page 1:

> WHEREAS, the Parties, intending to be bound by this
> Agreement, desire to set forth herein the terms,
> conditions and agreements under and by which (i) the Eye
> Street Seller shall sell to the Eye Street Purchaser and
> the Eye Street Purchaser shall purchase from the Eye
> Street Seller the Eye Street Property (as hereinafter

defined), and (i) [sic] the H Street Seller shall sell to
the H Street Purchaser and the H Street Purchaser shall
purchase from the H Street Seller the H Street Property
(as hereinafter defined).

Third, and importantly, the opening paragraph of the Agreement,

after listing the Eye Street Purchaser, the H Street Purchaser,

the Eye Street Seller, and the H Street Seller as the parties,

provided:

> Notwithstanding the above, (a) whenever the term **"Seller"**
> or **"Purchaser"** is used in this Agreement, it shall mean
> the seller or purchaser of the applicable portion of the
> Property referenced, or, as context requires, the sellers
> or purchasers of all or a portion of the Property, and
> (b) notwithstanding the conjunctive use of the term
> **"Seller"** or **"Purchaser"** in certain places in this
> Agreement, the obligations of Eye Street Seller and H
> Street Seller, as well as Eye Street Purchaser and H
> Street Purchaser, shall be independent and several
> obligations (and *not* joint and several obligations)
> except where the context of this Agreement clearly
> provides for a Seller or Purchaser performance obligation
> which, by its nature, is jointly applicable to Eye Street
> Seller and H Street Seller, or Eye Street Purchaser and
> H Street Purchaser, respectively.  The Seller and the
> Purchaser may sometimes be referred to in this Agreement
> collectively as the **"Parties,"** and individually as a
> **"Party."**

(Emphasis (bold and italics) in original.)  The parties did not

intend that the sale of one Property was to be dependent upon

whether a sale of the other Property closed.  The Eye Street

Property sale closed shortly after execution of the Agreement.

The sale of the H Street Property awaited timely satisfaction of

the H Street Acquisition Requirements.

IV

The Debtor's Second Amended Complaint attempts to hold MR

6

619 liable for an obligation under the Agreement, after the development of the Eye Street Property was completed, to convey space known as the Eye Street Retail Unit (carved out of the improved Eye Street Property) to the Eye Street Seller.  (The Eye Street Seller has assigned its rights in that regard to the Debtor).  For reasons discussed below, that was an obligation of the Eye Street Purchaser, not MR 619 as the H Street Purchaser.

A.

The term "Developer" in § 12.19.1 was unambiguous in meaning only the Eye Street Purchaser.  Section 12.19.1 of the Agreement provides that:

> [u]pon the completion of the development of the relevant portion of the Project which incorporates the Eye Street Property and/or adjacent properties by Developer (the **"Eye Street Improvements"**), Developer shall convey to Seller (or Seller Affiliate) by special warranty deed (and deliver to Seller or such Seller Affiliate possession of) [the Eye Street Retail Unit].

(Emphasis in original.)  Contrary to the Debtor's argument, the term "Developer" as used in that provision does not include MR 619.  The Agreement is not ambiguous in that regard because the Agreement is, in context, not fairly susceptible of the interpretation the Debtor urges, for the following three reasons.

First, only the Eye Street Purchaser would have been able to convey the Eye Street Retail Unit as required by § 12.19.1.  The Agreement did not contemplate that MR 619 (the H Street Purchaser) would acquire the Eye Street Property and be in a

7

position to convey it to the Eye Street Seller.  The H Street
Purchaser was not acquiring the Eye Street Property out of which,
after development was to be completed, the Eye Street Retail Unit
was to be carved out and conveyed to the Eye Street Seller.
Indeed, MR 619 has acquired no property pursuant to the
Agreement.  It made sense in § 12.19.1 to refer to the Purchaser
as the Developer because it was only after the Eye Street
Property was developed that the Eye Street Retail Unit was to be
conveyed to the Eye Street Seller.  Elsewhere, the Agreement
referred to the "Purchaser" conveying the Eye Street Retail Unit
to the Eye Street Seller:

- Section 12.19.5 of the Agreement states that "[u]pon
  the conveyance and delivery by Purchaser to Seller of
  the Eye Street Retail Unit, Seller shall pay to
  Purchaser Five Hundred Thousand and No/100 Dollars . .
  . which amount Seller may obtain by placing a mortgage,
  at Seller's cost, on the Eye Street Retail Unit at the
  time that Purchaser conveys and delivers the Eye Street
  Retail Unit to Seller."

- Section 12.19.6 of the Agreement states that "Purchaser
  will convey to Seller good and marketable fee simple
  title to the Eye Street Retail Unit."

Obviously, in context, "Purchaser" means the Eye Street
Purchaser.  The term  "Developer" is defined under Section

12.18.2(d) of the Agreement:

> The term **"Developer"** shall mean and refer to the
> Purchaser, and any Purchaser Affiliate which (i) acquires
> title to all properties that are a part of Purchaser's
> Assemblage, and (ii) develops the Project in accordance
> with this Agreement.   If more than one Purchaser
> Affiliate acquires title to any of the separate parcels
> and properties that form a part of Purchaser's
> Assemblage, then the term "Developer" shall be understood
> to mean, collectively, Purchaser and all Purchaser
> Affiliates.

(Emphasis in original.)   The term "Purchaser Affiliate" is

defined under § 12.4 of the Agreement , page 79, as follows:

> The term **"Purchaser Affiliate"** shall mean any entity
> which is directly or indirectly, through one or more
> intermediaries, controlled by, or under common control
> with, Purchaser or any of its affiliates, control being
> understood to mean the ownership of an economic and
> capital interest in the entity controlled, combined with
> the power and authority to make day-to-day management
> decisions for such entity

(Emphasis in original.)   I agree with MR 619 that:

> By asserting that MR 619 falls under the definition of
> "Developer" as a "Purchaser" under the PSA, or otherwise,
> the Debtor completely ignores the first sentence of the
> definition which provides that a Purchaser and any
> Purchaser Affiliate must have acquired title to at least
> one parcel of property that comprises Purchaser's
> Assemblage and must have developed the Project.   The
> second sentence of the definition is subject to the first
> sentence of the definition, and it is implicit in the
> second sentence of the definition that the reference to
> "Purchaser Affiliates" means Purchaser Affiliates that
> have acquired title to properties comprising Purchaser's
> Assemblage and that have developed the Project in
> accordance with the PSA.   This is the only construction
> that is consistent with both the first sentence of the
> definition of "Developer" and with Section 12.19.1 of the
> PSA which section implicitly requires Developer to own
> the Eye Street Retail Unit [in] order to be able to
> convey the Eye Street Retail Unit "by special warranty
> deed."

*Memorandum of Law of MR 619 H Street Capital LLC in Connection with Rule 3018 Hearing*, at 10 (Dkt. No. 110).

Second, although the term "Project" (as defined at page 15 of the Agreement) can be read as including both Properties, MR 619 was created only to purchase the H Street Property and is not acquiring that Property or any other Property, and thus it (1) was not acquiring title to the Eye Street Property, and (2) had nothing to do with the development of the Eye Street Property, and thus is not a Developer with respect to the Eye Street Property.  And, as discussed above, that is reinforced by § 12.19.1 which contemplates that the developer obligation regarding the Eye Street Retail Unit is to convey title by special warranty deed, something that only the Eye Street Purchaser could accomplish.  To elaborate, interpreting the Agreement otherwise would be contrary to the opening provisions of the Agreement that:

> the obligations of . . . Eye Street Purchaser and H Street Purchaser . . . shall be independent and several obligations (and not joint and several obligations) except where the context of this Agreement **clearly provides** for a . . . Purchaser performance obligation which, **by its nature,** is jointly applicable to . . . Eye Street Purchaser and H Street Purchaser . . . .

(Emphasis added.)  By its nature, the obligation to convey the Eye Street Retail Unit was an obligation applicable to the Eye Street Purchaser, and was not an obligation applicable to the H Street Purchaser who would not have the necessary title to convey

10

the Eye Street Retail Unit to the Eye Street Seller.  Certainly,
the Agreement did not **clearly** provide for a Purchaser performance
obligation which, by its nature, is jointly applicable to the Eye
Street Purchaser and MR 619 (the H Street Purchaser).

Third, the definition of "Developer" requires that an entity
"develops the Project in accordance with this Agreement" in order
to be a Developer.  MR 619 is not included in the definition of
"Developer" as a Purchaser, or otherwise, because it does not and
will not own any property which comprises Purchaser's Assemblage
and because it is not developing and will not develop the Project
in accordance with the Agreement.

B.

Even if the Agreement were ambiguous as to the meaning of
the term "Developer," which it is not, the background to this
provision indicates that the term "Developer" should be
interpreted in § 12.19.1 as not meaning MR 619 but only meaning
the Eye Street Purchaser.  Mark Tenenbaum, the attorney who was
negotiating the drafting of the Agreement on behalf of Debtor
never conveyed to his counterparts on the other side that he
intended the definition of "Developer" to mean both Purchasers
regardless of the particular part of the Agreement being
interpreted.  That is to say, Mr. Tenenbaum never told his
counterparts on the other side that he meant the term "Developer"
to make MR 619 liable for the obligations of the Eye Street

11

Seller.  In addition, the discussions that were held demonstrate
that the reference to "Purchaser Affiliates" in the definition of
Developer was intended to assure that whoever ended up with title
to the properties within one of the two Purchasers' Assemblages
would be on the hook to comply with the obligations relating to
that Assemblage.

C.

Finally, even if MR 619 had an obligation to convey the Eye
Street Property, which it does not, that obligation was
terminated.  Section 2.2.3(e)(ii)(D) makes clear that upon MR
619's exercising its right to cancel the H Street purchase, all
of its obligations under the Agreement were terminated.  The
Debtor does not dispute that MR 619 was entitled under § 2.2.4(c)
to terminate the Agreement because the H Street Acquisition
Requirements had not been met timely, in which case § 2.2.3(e)
would apply.  Under § 2.2.3(e)(ii)(D), such a termination of the
Agreement:

> shall be deemed to terminate any obligation on the part
> of Purchaser to develop Purchaser's Assemblage in a
> particular manner, or otherwise deliver the Condominium
> Properties to Seller, even if Purchaser thereafter
> acquires title to the H Street Property through a
> foreclosure of the H Street Mortgage pursuant to clause
> (C) of this subparagraph)[.]

This was reinforced by § 2.2.3(e)(iv), which provided:

> except as provided in the preceding clauses (i) - (iii)
> above, and any other provision of this Agreement that,
> by its terms, survives the termination of this
> Agreement, the Parties shall have no further

12

obligations or liabilities to one another under this
Agreement.

Accordingly, even if MR 619 could be viewed as a Developer
obligated to convey the Eye Street Retail Unit, the provisions of
§ 2.2.3(e) make clear that MR 619 (as the H Street Purchaser) no
longer had any such obligation upon its rightfully invoking a
termination under § 2.2.4(c).

V

In the Second Amended Complaint, the Debtor also asserts
that it has been damaged due to the breach of a promise under the
Agreement to provide parking spaces, specifically alleging that
"the PSA also promised the Seller that it would have the right to
park in the new garage that would be constructed as part of the
Eye Street Improvements." Second Amended Complaint, at 41,
¶ 160. Plainly it was the Eye Street Purchaser that was
obligated under that provision of the Agreement, as it was to be
the owner of the Eye Street Improvements.

VI

In the Second Amended Complaint, the Debtor asserts that by
sending the Notice of Termination also signed by the Eye Street
Purchaser, MR 619 violated the right of Debtor to receive the Eye
Street Retail Unit. Second Amended Complaint, at 40-41, ¶¶ 156-
57. This is the same argument raised by the Debtor during the
hearing of July 29, 2015, that was "rejected" by this Court
during the hearing and in its order of July 30, 2015. *See Order*

13

*re Objection to Claim of MR 619 H Street Capital, LLC*, at 2 (Dkt. No. 62) ("The debtor argues that by joining in the [Notice of Termination] submitted collectively by the Eye Street Purchaser and itself as the Purchaser, MR 619 should be viewed as engaging in the breach of the *Purchase and Sale Agreement* by the Eye Street Purchaser. I rejected that argument.") (italics in original). MR 619 was not obligated to convey the Eye Street Retail Unit to the Eye Street Seller. Accordingly, any contractual breach by way of a letter stating that the obligation to convey that unit was terminated could only be committed by the Eye Street Purchaser.

VII

In the Second Amended Complaint, the Debtor asserts that the H Street Deposit Note "incorporated the terms and conditions of the PSA and was expressly subject to the terms and conditions of the PSA." Second Amended Complaint, at 32, ¶ 118. Based on the alleged "material breach of the PSA by Purchaser", Debtor asserts that it has the right to rescind the Agreement and terminate its obligations under the H Street Deposit Note. Second Amended Complaint, at 47, ¶ 189. The H Street Deposit Note is the basis of the Claim and a copy of the note is attached to MR 619's proof of claim. The Debtor's premise that the H Street Deposit Note incorporated the terms and conditions of the Agreement is incorrect. Only the "applicable terms" of the Agreement are

14

deemed to be incorporated in the H Street Deposit Note, not all of the terms and conditions of the Agreement.  Further, the Agreement clearly provides that the Debtor remains liable to pay the outstanding principal and all accrued interest under the H Street Deposit Note notwithstanding the termination of the Agreement.  PSA, at § 2.2.3(f)(iv).  Moreover, for the reasons stated herein, MR 619 has not breached the Agreement as is alleged by Debtor in the Second Amended Complaint.

VIII

Finally, the Debtor attempts to hold MR 619 liable on a tort theory.  Its Second Amended Complaint alleges on page 55:

212.  Defendants knew that the Plaintiffs understood and interpreted the language added to § 2.2.3(e)(ii) of the PSA by the December 16 and December 18, 2012 drafts of the PSA as being limited only to making clear that if the H Street Purchaser acquired the H Street Property by way of foreclosure due to the failure of the H Street Seller to repay the H Street Deposit, that the H Street Purchaser would not be obligated to still deliver the H Street Condominium Units to the Plaintiffs.

213.  Defendants failed to disclose to Plaintiffs its hidden and ulterior objective that the language being added to 2.2.3(e)(ii) of the PSA by the December 16 and December 18, 2012 drafts of the PSA would be relied upon by the Defendants to deny Plaintiffs the material benefits of the Eye Street Retail Unit should the H Street Purchaser elect not to acquire the H Street Property due to the failure to achieve the H Street Acquisition Requirements.

The probable outcome in the jury trial in the Superior Court is that the Debtor will not be able to demonstrate that MR 619 committed a tort and, even if it did, that any substantial

15

damages would be awarded.

A

It is doubtful that a jury would conclude that MR 619 intentionally misled Mr. Tenenbaum on this aspect of the Agreement.  Section 2.2.4(c)(i) of the Agreement allows the H Street Purchaser not to purchase the H Street Property due to the failure to achieve the H Street Acquisition Requirements, which provision incorporates by reference § 2.2.3(e)(ii), page 13 of the Agreement.  Subpart (C) of § 2.2.3(e)(ii) stated that:

> if Seller fails to repay the outstanding principal balance of the H Street Note Deposit to purchaser within such 20 day period [i.e., 20 days after notice of termination due to the failure to achieve the H Street Acquisition Requirements was issued], H Street Purchaser will be entitled to commence the exercise of remedies under the H Street Mortgage up to the date all amounts outstanding under the H Street Deposit Note have been paid in full.

On December 16, 2012, Eugene Tibbs, the attorney for MR 619 and the Eye Street Purchaser, sent a revised redline version of the purchase and sale agreement to Mr. Tenenbaum, and among the many proposed changes in the document was a short phrase added by Mr. Tibbs to the end of subpart (C) of § 2.2.3(e)(ii) which read "in which case, all of Seller's rights in the Property shall be extinguished, and Purchaser shall be free to develop the Property without providing the Condominium Properties to Seller."  Mr. Tibbs had added this additional phrase to a section of the Agreement which dealt exclusively with the rights and obligations

16

of the H Street Seller and H Street Purchaser with respect to the
H Street Property.

The obvious purpose of this additional phrase was to clarify
that, should the H Street Purchaser end up acquiring the H Street
Property through a foreclosure sale after termination of its
obligation to purchase the H Street Property, the H Street
Purchaser would not have a continuing obligation to convey to the
H Street Seller the so-called H Street Retail Unit and H Street
Basement Unit that were to be built as part of the H Street
Improvements.  However, the specific language proposed by Mr.
Tibbs incorrectly stated that upon a default "all of the Seller's
rights in the Property shall be extinguished."  This was an
incorrect statement as a matter of law in that the exercise of
the rights to foreclose under the H Street Mortgage did not
immediately extinguish at that time all of the Debtor's rights in
the H Street Property.  Rather, upon a default the Debtor would
still retain fee simple ownership of the H Street Property, along
with whatever rights and protections it had under the H Street
Mortgage, until such time as the foreclosure process was
completed and legal title to the H Street Property was conveyed
to a third party as a result of the foreclosure sale.

Upon receipt of the December 16, 2012, draft of the
Agreement from Mr. Tibbs, Mr. Tenenbaum had a phone call with Mr.
Tibbs and pointed out this problem with his proposed language.

17

In order to make the phrase consistent with the intended purpose of the change and applicable law, Mr. Tenenbaum proposed alternative language in lieu of the phrase suggested by Mr. Tibbs, which read as follows:

> (D) the termination of this Agreement by Purchaser under this Section 2.2.3(e) shall be deemed to terminate any obligation on the part of Purchaser to develop Purchaser's Assemblage in a particular manner, or otherwise deliver the Condominium Properties to Seller, even if Purchaser thereafter acquires title to the H Street Property through a foreclosure of the H Street Mortgage pursuant to clause (C) of this subparagraph.

Mr. Tenenbaum discussed the changes to § 2.2.3(e) with Mr. Tibbs at the time the December 16 and December 18, 2012, drafts were exchanged.  During that discussion, they did not discuss the meaning of "Condominium Properties."  Mr. Tenenbaum did not believe it was necessary to clarify that it referred solely to the H Street Retail Unit and the H Street Basement Unit because he thought it was obvious that the whole section applied only to the H Street transaction.  Mr. Tibbs also did not recall discussing this particular issue with Mr. Tenenbaum but his belief (both then and now) was that "Condominium Properties" would encompass both (1) the H Street Retail Unit and the H Street Basement Unit and (2) the Eye Street Retail Unit.

Both attorneys were under great pressure to quickly finish the drafting of the contract and only were discussing particular language if one of them thought there was a problem.  There is no evidence to suggest that Mr. Tibbs or MR 619 intended to hide

their interpretation of this clause from Mr. Tenenbaum and the
Debtor, and indeed Mr. Tibbs's demeanor and testimony at the
hearing indicated that he would not be the kind of person to
engage in such chicanery.  To the extent that Mr. Tenenbaum's
addition of part (D) to § 2.2.3(e)(ii) benefitted MR 619, he is
the one who drafted it, and MR 619 had no obligation to inform
him that this provision would permit termination of the entire
Agreement if the Agreement did indeed support such an
interpretation.

B

Even if a jury found that the Debtor was intentionally
misled, little or no damages would likely be awarded *against MR
619* based on this tort theory.  The jury would likely conclude
that, when MR 619 tendered its notice of termination, there was
no termination of the obligation of the *Eye Street Purchaser* to
convey to the Eye Street Seller the Eye Street Retail Unit.  Like
the rest of the Agreement, and as contemplated by the opening
paragraph of the Agreement, the provisions that MR 619 argues
resulted in a termination of the obligation to convey the Eye
Street Retail Unit must be read in context, and when read in
context they do not support MR 619's argument:

- The jury would likely conclude that the reference to
  "Condominium Properties" in § 2.2.3(e)(ii)(D) referred
  to the Condominium Properties that MR 619 was required

19

to convey to the Debtor if the sale of the H Street
Properties went through, not the Eye Street Retail
Unit.  This is because § 2.2.3(e)(ii)(D) is part of
§ 2.2.3 ("H Street Seller Withdrawal and Contingent
Repayment of H Street Deposit"), dealing with the
obligations and rights of the Debtor and of MR 619
under the Agreement, and not dealing with the
obligations and rights of the Eye Street Seller and of
the Eye Street Purchaser.

•   Similarly, the jury would likely conclude that the
reference in § 2.2.3(e)(iv) to "the Parties shall have
no further obligations or liabilities to one another
under this Agreement" meant the Parties whose
obligations were being addressed under § 2.2.3, namely,
the Debtor and MR 619, and not as including the Eye
Street Purchaser and the Eye Street Seller.  The
opening paragraph of the Agreement makes clear that
"Parties" can refer to the Seller and Purchaser of one
Property (the Eye Street Property or the H Street
Property) and is not required to mean both Sellers and
both Purchasers.

•   The same is true of § 2.5.2(b)(iii)(A) in referring to
"the Parties" because that provision is, again, part of
a section, § 2.5.2 ("H Street Adjustments") that deals

20

with the obligations and rights of the Debtor as the H
Street Seller and of MR 619 as the H Street Purchaser.

- The H Street Retail Unit and the H Street Basement Unit
  were each a "Condominium Property" and thus the
  reference in § 2.2.3(e)(ii) to "Condominium Properties"
  can be read as meaning *those* Condominium Properties, as
  only the H Street Purchaser's obligation to convey
  those two unit was at issue in § 2.2.3(e)(ii).

Because the Eye Street Seller's right (now held by the Debtor) to
receive the Eye Street Retail Unit would remain in place, the
Debtor would be entitled to recover any damages for a breach of
that Agreement.  Therefore, the jury would not likely find it
necessary to award damages under a tort theory other than,
perhaps, attorney's fees incurred fighting against an
interpretation of the Agreement that treated the entire Agreement
terminated.

In any event, even if MR 619 could be held liable on this
tort theory, the Debtor failed to quantify the amount of such
attorney's fees, and a jury would have a difficult time
allocating the attorney's fees in the parties' litigation between
attorney time spent litigating contract issues versus attorney
time litigating any damages arising from failure of MR 619 and
the Eye Street Purchaser to disclose that they viewed
§ 2.2.3(e)(ii)(D) as permitting termination of the obligation of

the Eye Street Purchaser to convey the Eye Street Retail Unit.

C

In light of the Agreement's true contextual meaning, the tort theory does not work at all.  The Debtor relied upon what is the correct interpretation of the Agreement insofar as whether the Eye Street Purchaser's obligation to convey the Eye Street Retail Unit survived MR 619's termination of *MR 619's* obligations under the Agreement.

Assume that MR 619 and the Eye Street Purchaser knew that the Eye Street Seller held the view that an invocation by MR 619 of § 2.2.3(e)(ii)(D) would *not* terminate the Eye Street Purchaser's obligation to convey the Eye Street Retail Unit to the Eye Street Seller.  Their failure to disclose their contrary view of the effect of § 2.2.3(e)(ii)(D) would have had adverse consequences only if their view was a correct view of what the Agreement, on its face, provided.  In other words, concealing an erroneous view of what the Agreement provided caused no damage.  Advancing now (and after the invocation of  § 2.2.3(e)(ii)(D)) their *erroneous* view of the Agreement is meaningless as far as harming the Debtor is concerned because the Debtor's *correct* view of the Agreement will prevail.  In that regard, MR 619 and the Eye Street Purchaser are free in litigation, within the advocacy limits imposed by Fed. R. Bankr. P. 9011 (or its Superior Court equivalent) to urge the court to adopt their erroneous

22

interpretation, and the Debtor does not suggest, in this complicated contract interpretation dispute, that the arguments that MR 619 and the Eye Street Purchaser have advanced here and in the Superior Court do not conform to those advocacy limits.

Moreover, even if, hypothetically, the Agreement had contained a right to treat the obligation to convey the Eye Street Retail Unit as terminated if the H Street Purchaser invoked § 2.2.3(e)(ii), that obligation was the Eye Street Purchaser's obligation.  It is only the Eye Street Purchaser who has standing to take the position that the obligation was terminated.  If the Eye Street Purchaser declined to take the position that its obligation was terminated, it would not matter that the H Street Purchaser maintained that the obligation was terminated.  So it is the Eye Street Purchaser who has engaged in conduct regarding the interpretation of § 2.2.3(e)(ii)(D) that has allegedly caused the Debtor harm.  Stated differently, it was the Eye Street Purchaser that had a duty to deal fairly with the Eye Street Seller in not concealing its belief that the Agreement permitted it to treat the obligation as terminated upon the H Street Purchaser's invocation of § 2.2.3(e)(ii), if it understood that the Eye Street Seller was under the erroneous belief to the contrary.  So any tort of concealing the belief that it, the Eye Street Purchaser, had such a right lies at the door of the Eye Street Purchaser, not the H Street Purchaser.

23

IX

An appropriate order follows.

[Signed and dated above.]

Copies to: Recipients of e-notification of filings.